JjBYRNES, Chief Judge.
The defendant was charged by grand jury indictment with the March 20, 1981 first degree murders of Allen Chance, Geraldine Chance, and Spring Hewitt. He was arraigned on April 24, 1981 and pled not guilty on all three counts. Trial was held on August 12 and 13, 1981, and the defendant was found guilty on all three counts. Following the sentencing phase of the trial, the jury recommended life imprisonment on all three counts. On September 16, 1981, the defendant was sentenced to three consecutive terms of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. His convictions and sentences were affirmed in an errors patent appeal. State v. Vincent, unpub. KA-0814 (La.App. 4th Cir.1/11/85). The Court found the evidence sufficient to support the convictions pursuant to State v. Raymo, 419 So.2d 858 (La.1982). On September 1, 1992, this Court ordered that the defendant be granted an out of time appeal pursuant to Lofton v. Whitley, 905 F.2d 885 (5th Cir. 1990). Defendant’s conviction and sentence were affirmed on appeal. State v. Vincent, unpub., 93-1384 (La.App. 4 Cir. 2/25/95), 633 So.2d 975, writ denied 94-0975 (La.9/2/94), 643 So.2d 139.
12According to this writ application, the defendant was granted a new trial in November 2000 by the United States Fifth Circuit.[1] On June 5, 2001, the defense filed a motion to preclude the State from using the testimony of a witness given at the defendant’s original trial. Following a hearing on August 8, 2001, at which testimony was taken from three witnesses, the trial court granted the motion. The State objected and gave a notice of intent to seek writs; the court set a return date of September 7, 2001.
On August 23, 2001 the trial court granted the defendant’s motion for a speedy trial and set trial for October 15, 2001. The court denied the State’s motion for a stay order pending a disposition of this writ application.
Although the State timely filed its application and provided copies of the pleadings filed relative to the motion to preclude the use of prior testimony of Jules Austin (the only eyewitness to the murders), the State did not provide the transcript of the August 8, 2001 hearing or the original trial testimony of Austin. Pursuant to an order from this Court, the State later supplemented its application with the August 8th transcript. Also, the defense filed an opposition. Because neither party provided the original trial testimony of Austin as an exhibit, the record from the defendant’s second appeal was obtained from LSU by this Court. This Court ordered the trial stayed.

STATEMENT OF THE FACTS

The facts of this case as reflected in this Court’s opinion are as follows:
On March 20, 1981, at 621 Homer Street in the Algiers section of New Orleans, Allen Chance, his wife, Geral *994 dine Chance, and her ten year old daughter, Spring Hewitt were brutally murdered. The lone survivor was Jules Austin who resided at the same address.
|sAt about noon on the day of the murders, Geraldine Chance and Spring Hewitt were upstairs in the house. Allen Chance was not at home at the time and Jules Austin was in his room located in the rear of the house. Austin was residing in the Chance home temporarily due to a fire at his residence. He was a close friend of Allen Chance.
Austin heard a knock at the front door. Geraldine Chance came downstairs and opened the door. An argument ensued between Geraldine Chance and the defendant over a $5.00 debt. Austin, believing the visitor had come to purchase marijuana, went towards the front of the house. As he entered the front room, he saw two men, one of whom was the defendant. When the men saw Austin, they pulled hand guns from underneath their coats. The men ordered Austin and Geraldine Chance to lie on the floor. Austin and Geraldine were then bound and gagged. The men then proceeded to question the victims as to the whereabouts of the marijuana and as to the manner in which Allen Chance entered the house (used his key or knocked). Defendant dragged Austin into his room and removed forty dollars from his pocket. The men then took Geraldine into the kitchen. A few minutes later defendant returned to Austin’s room and began stabbing him in the head, back, shoulder and rib cage. With the last thrust of the knife into his rib cage, Austin folded up and feigned death.
The defendant then left the room and returned to the kitchen. Austin could hear Geraldine begging for her life and that of her daughter, Spring Hewitt. He then heard Spring Hewitt calling for her mother. He then heard rumbling in the kitchen and upstairs. Several times during these events, defendant returned to Austin’s room to make sure he was dead. The two men then waited twenty to thirty minutes before Allen Chance returned home. After Chance entered the house, Austin heard defendant and Chance arguing about a double-cross of defendant by Allen Chance. Austin then heard the three men proceed upstairs where he head more noise and rumbling. Ten to fifteen minutes later the two men came downstairs and left through the back door. As they were leaving, Austin heard the defendant say “[n]o one is going to know what happened in this house.” Eventually Austin freed himself, went into the kitchen where he found Geraldine Chance dead on the floor. He then called the police.
When the police arrived they found a large pool of blood on the floor in the front room, blood in the back room and the body of Geraldine Chance on the floor in the kitchen. Upstairs, in a back bedroom, the police found the body of Allen Chance. He was gagged and his hands and feet were bound behind his back. The knife, which was used to kill him, was buried up to the hilt, in the back of his neck. In another upstairs bedroom police found the body of Spring Hewitt. She too, like Allen and Geraldine Chance, had been gagged and bound with her hands Rtied behind her back. All the victims had been stabbed repeatedly.
Jules Austin was taken to Jo Ellen Smith Hospital where he remained in critical condition for several days.
On March 25,1981, Austin gave a description to police artist Johnny Donnell who drew composite pictures of the two suspects.
*995 On March 28, 1981, Austin met with homicide detective, John Dillman, and positively identified the defendant, Kenneth Vincent, from police photographs. He signed and dated the photo of defendant and initialed the remaining photographs.
The defendant was subsequently arrested at his home on April 7, 1981 and charged with the first degree murders of Allen Chance, Geraldine Chance and Spring Hewitt.
State v. Vincent, pp. 2-3.
Additionally, in connection with the defendant’s assignment of error on appeal that the trial court should have suppressed the photographic identification made of him by Jules Austin, this Court reviewed the testimony from the motion to suppress identification hearing:
At the hearing on the motion to suppress, Officer Fred Dantagnon testified that he interviewed Jules Austin in the hospital on March 20, 1981. At that time Austin did not know the perpetrators’ names. Dantagnon stated he subsequently obtained a description from Austin who then helped Donnell sketch a composite of defendant on March 25, 1991. On March 27, 1991, Dantagnon showed Austin three sets of photographs which did not contain a photograph of defendant. Austin made no identification.
On cross examination, Dantagnon testified that on March 23, 1981, three days after the murders, Austin told him that he knew the perpetrator by sight because he had seen him in the victim’s home on several occasions. He admitted the police received several anonymous telephone calls naming “Jerome Sparks” and a man named “Kenneth” as the perpetrators. Other callers gave other names. He testified that at his first meeting with Austin, Austin described one perpetrator as between 5'11" and 6'1" in height with a slim build. He was wearing a baseball cap and had long sideburns and a scar on the left side of his face. Austin described defendant as short and stocky built with close cropped hair between 5'6" and 5'8" in height and weighing 175 pounds. Both perpetrators were black and between twenty and twenty-one years of age.
| ..¡Detective Dillman’s testimony corroborated that of Detective Dantagnon. Austin told Detective Dillman that he did not know the names of either perpetrator but that he had seen the men on several occasions in the neighborhood and at the victim’s home prior to the murders. One interview with Dillman was at the hospital and another at the homicide office. On March 28, 1981, Dillman showed Austin a set of photographs which contained defendant’s photograph. Both men were in the front seat of Dillman’s car. Dillman instructed Austin not to make an identification until he viewed all six photos. When Dillman placed defendant’s photo on the seat (the second photograph), Austin told him he need go no further, that the photograph was that of his assailant. Dillman then instructed Austin to view all six photos again. Austin complied. Austin was positive of his identification of defendant.
Jules Austin testified that he met with Dantagnon, Dillman and Donnell on March 25, 1981. At that time he gave the description for Donnell to sketch the composite. Austin stated he did not give them a description while he was in the hospital. He stated he viewed three sets of photographs with Dantagnon on March 27, 1981 but did not identify the perpetrators. On March 28, 1981, Dill-man drove to Austin’s house. He and Dillman sat in Dillman’s car and Dillman *996 began placing photographs on the seat face down. Austin testified that after he picked up the second photograph he was positive it was his assailant. At Dill-man’s request he again viewed all six photos. He was positive of his identification of defendant. He denied that Dillman suggested to him which photograph to choose. He stated that he had seen defendant on the street at least twenty-five to thirty times and at the home of the victims on four or five occasions. Austin did not know defendant’s name. He testified that he did not immediately recognize defendant when he first saw him in the house because he had a stocking over part of his face. Eventually, as the crime progressed, he was able to see him in better lighting. In addition, he also recognized defendant’s distinctive voice.
On cross examination, Austin testified that he had seen the back of the photographs before choosing and that the photo he chose had “Kenneth” written on the back. However, he stated this in no way affected his identification because he did not know defendant’s name.
Id., pp. 9-11.
A review of the appeal record further shows that the defense presented witnesses at trial. Notably, the defense first recalled Officer Dantagnon to question him about the description of the defendant given to him by Jules |fiAustin, in particular the height and weight description. The defense next called James Alexander who stated that he knew both Jules Austin and the defendant and had seen them together twice. Both times, he heard Austin refer to the defendant by the name Kenny Vincent. Also, to Alexander’s knowledge, the defendant previously went to the victims’ home at 621 Homer Street to purchase marijuana many times, but had not done so in a couple of months.
The next defense witness, Harold Cunningham, testified that on the day of the murders the defendant was with him waiting for someone to come with a truck so that Cunningham could move. The defendant was with him from approximately 10:45 a.m. until the mid-afternoon. Cunningham’s house was only three blocks from the victims’ home. Harold Cunningham further testified that the defendant bought marijuana many times from the adults at the Homer Street house.
The defendant’s sister testified that she saw the defendant on the day of the murders at approximately 2:30 p.m. as he was on his way home. She was questioned on direct examination on whether the defendant had ever had a moustache; she said he had not, nor had he ever owned a fatigue jacket.
The defendant testified on his own behalf to the fact that he was with Harold Cunningham at the time of the murders. He also stated that the victims’ home was only two blocks from his and that he had been to their house before. He stated that he had gone there to purchase marijuana. Also, he stated that Jules Austin had known him for a long time because Austin’s stepchildren and the defendant had been- “raised” together. The defendant stated that he saw Austin at the Homer Street house many times when he was purchasing marijuana. However the defendant stated he had not been there for approximately one month prior to the murders because he had |7found a supplier with a better quality of marijuana. The defendant testified that Jules Austin knew him by name, that he and Austin had never had any problems, and that he could not give any reason why Austin would lie about him being one of the murderers.

DISCUSSION

The issue in this writ application is whether the State should be permitted to *997 present the testimony given by Jules Austin at the defendant’s first trial to the jury at the retrial. There is no dispute about the unavailability of the witness as he is deceased. Instead, the defense contended that there were statements given by Austin which were not disclosed to the defense prior to the first trial and that these statements could have been used to impeach his credibility and identification of the defendant as the perpetrator.
The use of prior testimony was discussed by the Louisiana Supreme Court in State v. Jones, 2000-2837 (La.6/29/01), 791 So.2d 622, in circumstances similar to the instant case, i.e., where the defense had learned of information which might have been used for impeachment purposes after the now-deceased witness’s testimony had been given at a motion to suppress identification hearing:
As does its federal counterpart, Fed.R.Evid. 804(b)(1), La. C.E. art. 804(B)(1) provides an exception to the hearsay rule for testimony given by an unavailable declarant as a witness in another hearing in the same case “if the party against whom the testimony now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.” The
statute incorporates a firmly-rooted exception to the hearsay rule. Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895); United States v. Koon, 34 F.3d 1416, 1426 (9th Cir.1994), rev’d on other grounds, 518 U.S. 81, 116
S.Ct. 2035, 135 L.Ed.2d 392 (1996). The provisions of art. 804(B)(1) subsume jurisprudential criteria designed to protect the defendant’s right to [ ^confrontation under the Sixth Amendment and La. Const. art. I, § 16. See State v. Hills, 379 So.2d 740, 743-44 (La.1980). In the present case, before the state’s disclosure of Artberry’s prior statements, the trial court, court of appeal, and this Court had all rejected respondent’s argument that La. C.E. art. 804(B)(1) did not apply to Artberry’s testimony at the suppression hearing because defense counsel was motivated by different concerns at that proceeding than he would have been at trial....
The subsequent revelation of Artber-ry’s prior statements does not change our view as to the admissibility at trial of the witness’s prior recorded testimony. In conducting the suppression hearing, the trial court not only allowed defense counsel the opportunity to confront and cross-examine Artberry but also permitted him to question the witness extensively as to his ability to perceive accurately and to recall the events of that evening....
State v. Jones, p. 5-6, 2000-2837 (La.6/29/01), 791 So.2d 622, 624-25. The court further stated:
We note ... that La.C.E. art. 806 provides an important safeguard for the use of prior recorded testimony of an unavailable declarant in cases in which counsel, either because he was unaware of the information or because he chose not to pursue certain lines of cross-examination at the prior hearing, failed to delve into evidence that might have a bearing on the factfinder’s determination of guilt or innocence at trial. The article provides that “[wjhen a hearsay statement ... has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if de-clarant had testified as a witness.” See, e.g., Carver v. United States, 164 U.S. 694, 698, 17 S.Ct. 228, 230, 41 L.Ed. 602 (1897) (“In nearly all the cases in which *998 the question has arisen, evidence of other statements by the deceased inconsistent with his dying declarations has been received.”); State v. Henderson, 362 So.2d 1358, 1363 (La.1978)(“[S]ince the dying declaration is in effect a testimonial statement .... impeachment by bad testimonial character is allowable, or by conviction of a crime, or by prior or subsequent inconsistent statements.”). To facilitate introduction of the impeaching evidence, La.C.E. art. 806 further provides that “[e]vidence of a statement or conduct by the declarant at any time, offered to attack the declarant’s credibility, is not subject to any requirement that he may have been afforded an opportunity to deny or explain.”
At trial, the defense may therefore introduce one or both of Artberry’s statements as it sees fit to acquaint jurors with all of 13the circumstances surrounding the witness’s identification of respondent and thereby allow them to reach a reliable determination as to the accuracy of the identification. As in any other case, the defense may thereby establish salient points for closing argument that the witness’s inconsistent and conflicting accounts and his motive for deflecting attention from himself because he had directly participated in the events leading to the victim’s death, rendered his identification testimony unworthy of belief. See Watkins, 449 U.S. at 348, 101 S.Ct. at 658 (Because “the proper evaluation of evidence under the instructions of the trial judge is the very task our system must assume juries can perform,” the fundamental safeguard against convictions based on unreliable identification testimony is cross-examination of the identification witnesses at trial and argument “in summation as to factors causing doubts as to the accuracy of the identification — including reference to both any suggestibility in the identification procedure and any countervailing testimony as to alibi.”). Jurors will not have benefit of “ ‘a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.’ ” Roberts, 448 U.S. at 63-64, 100 S.Ct. at 2538 (quoting Mattox, 156 U.S. at 242-43, 15 S.Ct. at 339). However, the loss of this aspect of the Confrontation Clause in the present case stems not from the state’s withholding of Artberry’s statements before the suppression hearing but from the unexpected death of the witness before respondent’s first trial. Even assuming that counsel had thoroughly cross-examined Artberry at the suppression hearing about his prior statements, no jury in this case would ever have had the benefit of viewing Artberry’s demeanor as counsel questioned him with regard to the extent of his self-contradiction or motive and bias in the case. The state’s failure to disclose Artberry’s prior statements promptly therefore has no bearing on the necessity arising from the witness’s untimely death that jurors must determine the reliability of Artberry’s identification on the basis of the cold record of his testimony at the suppression hearing, as tested by counsel’s detailed cross-examination at the time, and as tested by the defense at trial under the provisions of La.C.E. art. 806.
Jones, pp. 11-13, 791 So.2d at 627-29.
In the instant case, the trial court ruled that the State could not introduce the testimony of Jules Austin because, prior to *999 the first trial, the defense had not been provided with a taped statement he made to the police and with police reports which contained narratives which purported to be | ^statements from Austin. However, there is nothing in the court’s ruling to indicate that it found that these statements were in and of themselves exculpatory. Furthermore, a review of the testimony of Dwight Doskey, one of the defendant’s original trial attorneys, given at the evi-dentiary hearing on August 8, 2001 shows that Mr. Doskey viewed the statements merely as potential material for cross-examination.
During the evidentiary hearing, Mr. Doskey testified that to his recollection the police reports and the taped statement of Jules Austin was not provided to the defense. However, he also admitted that, as a legal matter, the defense was not entitled to the incident reports at that time, and are not even entitled to witnesses’ statements now unless there is a constitutional basis. Notably, a review of the pretrial motion hearing in 1981 shows that the State at that time was ordered by the trial court to produce police reports and witnesses’ statements for an in camera inspection by the court to determine whether they contained any exculpatory material. In accord with that, Mr. Doskey testified at the evidentiary hearing that the defense was aware that Jules Austin had made a statement, “but it was the law back then; you didn’t get it unless there was contradictory whether Brady or Kiles (sic) material and we never received it.” It is clear therefore that there is no issue in this case that the statements constituted exculpatory material per se, but rather had value only as impeachment material to the extent that Austin’s trial testimony conflicted with prior statements.
As to the impeachment value, Mr. Dos-key outlined three areas which he would have explored more thoroughly if he had had the statements: (1) what happened while the perpetrators were in the house; (2) the number of people who were actually involved in the incident; and (3) whether or not In Jules Austin already knew the people who came in and what degree of recognition he had as to the people who came into the house.
As to the first issue, the defense has produced a chart allegedly showing inconsistencies in the statements and the testimony of Jules Austin. However, the so-called inconsistencies more often are less complete answers or variations in terminology, for example whether the men had on “masks” or “stockings”, exactly where he was at the time the perpetrators first entered the house, and so forth. Furthermore, the taped statement made by Austin, as opposed to the police reports which are themselves not verbatim accounts from Austin, is fairly consistent with Austin’s trial testimony. As to the descriptions of the defendant and his co-perpetrator, this information was brought out during examination of the police officers and both Austin, the homicide detectives, and the police sketch artist were closely cross-examined on any discrepancies.
As to the second issue, the number of people involved, in the taped statement made by Jules Austin to the homicide detectives on March 26, 1981, Austin was asked whether, to his knowledge, there were “any other persons with these two subjects before they entered the residence,” to which he responded, “Not, to my knowledge, there was a third guy standing on the porch when they came in but I do not know if he was with them or not....”. Furthermore, the initial handwritten police report recounts that Austin told the district officer that he and other *1000 people had been stabbed and shot by four negro males. At trial, Austin stated that there was no third person involved. While these appear to be discrepancies, it does not appear that they directly impact the identification of the defendant as one of the two men who entered the house. The fact that other people may have been involved hpdoes not lessen the defendant’s guilt. Furthermore, even in the taped statement, Austin makes it clear that he is unsure whether a third person was involved.
As to the third issue, Austin’s ability to recognize the perpetrators and his acquaintance with the defendant, the trial transcript shows that a thorough cross-examination was conducted. Moreover, the defense presented witnesses, including the defendant, who testified the fact that Austin knew the defendant by name. It is difficult to see what more counsel could have done simply by being in possession of the taped statement of Austin.
Under Jones, supra, the State at a retrial may introduce any prior statements which contradict Austin’s trial testimony to “impeach” him, and his present counsel may argue any inconsistencies to the jury. An important fact to note in this regard is that, at the evidentiary hearing, the defense presented more witnesses to testify to the prior relationship between Austin and the defendant, and defense counsel stated that it was the intention of the defense to put on evidence to show that Austin intentionally falsified evidence against the defendant. Ms. Sandra Dickson testified that Austin had thrown the defendant out of Austin’s pool hall. Darryl Falls testified that he had a conversation with Jules Austin approximately one week after the murders and that Austin said the police forced him to name someone for the sake of the little girl who was killed. Thus, the defense will be consistent at both trials, that Jules Austin was better acquainted with the defendant than he told the police he was, and presumably, intentionally misidentified the defendant rather than made a good faith misidentifi-cation.
| ^Relying on Jones, supra, and based upon the foregoing analysis we find that in light of Jones, the trial court erred in ruling that the prior testimony of Jules Austin is inadmissible. Accordingly, the trial judgment of the trial court is reversed and the case is remanded.
REVERSED AND REMANDED.

. This writer has been unable to locate a Westlaw citation for such a ruling, and nothing ill the writ application exhibits reflects this ruling.